693 A.2d 773

**BALTIMORE GAS AND ELECTRIC COMPANY**

v.

**Michael HENDRICKS et al.**

**No. 78, Sept.Term, 1996.**

Court of Appeals of Maryland.

May 7, 1997.

Reconsideration Denied June 10, 1997.

510

Marc K. Sloane (Paul W. Davis, on brief), Baltimore, for appellant.

Sandra L. Hall, Asst. General Counsel (Bryan G. Moorhouse, General Counsel; Susan S. Miller, Asst. Gen. Counsel, on brief), Donald F. Rogers, Asst. People's Counsel (Michael

**512**

J. Travieso, People's Counsel, on brief), Baltimore, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

Baltimore Gas and Electric Company (BG & E) complains about an order of the Public Service Commission (PSC) precluding the company from terminating utility service to Michael Hendricks at 4500 Kathland Avenue. The Circuit Court for Baltimore County affirmed the PSC order. We granted *certiorari* before BG & E's appeal could be heard by the Court of Special Appeals and shall affirm the judgment of the circuit court.

The underlying dispute concerns whether Hendricks is responsible for a $1,166 bill for utility service rendered to the Kathland Avenue property during the period from July 30, 1990 through July 24, 1991.[1] BG & E sought to terminate service because of the unpaid bill. Hendricks, the current owner and occupant of the property, claimed that he did not order the service for that period and therefore did not owe the money. At issue, essentially, is which party had the burden of proof, what was required to be proved, and what standard of proof was to be applied.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. The Dispute

Mr. Hendricks maintains that, on July 24, 1991, he telephoned BG & E to request that gas and electric service for 4500 Kathland Avenue be started in his name. The company representative informed him that he would have to pay a deposit of $174 and a $20 application fee. By September 4,

---

1. The original amount in dispute was $1,353. Hendricks later acknowledged responsibility for $187 of that amount, leaving $1,166 in controversy.

1991, both amounts had been paid. Two weeks later—on September 19—BG & E sent employees to read the meters.

As a result of those readings, BG & E sent Hendricks a bill for $1,353. Upon Hendricks's inquiry, BG & E informed him that the bill was for gas and electric service from July 30, 1990 through September 19, 1991. When Hendricks protested that he had not ordered any service prior to July 24, 1991 and had not occupied the property before then, BG & E responded that, according to its records, it had received a telephone call on July 27, 1990 from someone claiming to be Michael Hendricks requesting that the gas and electric service be placed in his name and that, upon that request, service had been continued to the property in that name. Hendricks asserted that he had made no such call and claimed that James W. Dandridge, a former business associate of Hendricks and the former owner of the property, must have made the call, impersonating Hendricks.

Although there are no termination notices in the record before us, testimony was presented at the PSC hearing that BG & E had terminated service to Hendricks on three occasions because of the unpaid bill—in December 1991, in May 1993, and in June 1993. Hendricks said that, on each occasion, he went to the BG & E office, denied his responsibility for the bill, provided BG & E with the documents it requested, and paid reconnection fees. Throughout this time, he paid his current monthly utility bills but made no payment on the alleged arrearage.

BG & E investigated the claim and reviewed the documents provided by Hendricks but nonetheless continued in its belief that he was responsible for the bill. It did, however, agree to continue providing service pending a resolution of the dispute.

### B. Administrative Proceedings

Pursuant to its statutory authority to adopt rules and regulations (Maryland Code (1957, 1995 Repl.Vol.), Art. 78, § 64), the PSC has adopted a set of regulations governing the termination of service by public utilities subject to its jurisdic-

tion. They appear in Code of Maryland Regulations (CO-MAR), title 20, subtitle 31. In relevant part, they make clear that, although a customer is responsible for past due bills for service provided to that customer (COMAR 20.31.01.03D), a utility may not terminate service because of the failure of a previous customer to pay for service to the premises (COMAR 20.31.02.01A).

In subtitle 32 of title 20, the PSC has established a multistep procedure for resolving disputes over utility bills. A "disputed bill" is defined as a bill "which is the subject of a controversy between a customer and a utility regarding [among other things] billing for service for which the customer alleges he [or she] was not responsible." COMAR 20.32.01.02(5); *see also* COMAR 20.31.01.02B(3). The first step in the dispute resolution process with respect to terminations of service is for the customer to present an inquiry to the utility, which is required to investigate the inquiry. CO-MAR 20.32.01.03. If the dispute cannot be settled at that level, the customer may submit an inquiry to the PSC, which, in turn, may refer the inquiry to its Consumer Assistance and Public Affairs Section (CAPA). COMAR 20.32.01.04.

Upon such a referral, CAPA may require the customer to submit a more detailed written inquiry, including copies of relevant correspondence and other documentation. After obtaining information from the customer and the utility and reviewing applicable laws, regulations, and tariffs, CAPA attempts to mediate between the parties. COMAR 20.32.01.04F. CAPA may close the inquiry if it finds that the utility has proceeded in accordance with applicable law and its tariff.

If either party is dissatisfied with the CAPA decision, the party may request further review by filing a request with CAPA's Director. If dissatisfied with the action of the Director, a party may file a complaint with the PSC pursuant to Md.Code art. 78, § 77 and COMAR 20.07.03.

Section 77 of article 78 requires the PSC to receive complaints from any person alleging circumstances that would

constitute a violation of the article. If the Commission determines that the complaint is "deserving of explanation," it requires one from the utility. In any event, it is directed, in the absence of voluntary satisfaction, to take final action on every complaint. Although the PSC is exempt from the contested case provisions of the Administrative Procedure Act, *see* Md.Code, State Government article, § 10–203(a)(3)(vi), provisions regarding proceedings before the Commission are set forth in article 78 and in the COMAR regulations.

Proceedings conducted by the Commission on consumer complaints are regarded as contested cases, and, if the Commissioner determines to proceed on a consumer complaint the utility is entitled to an evidentiary hearing. Art. 78, §§ 79–82. Upon an appeal from a termination proceeding handled by CAPA, the PSC may determine the matter based on the record before CAPA or conduct further proceedings. COMAR 20.07.03.04.

The PSC is authorized by art. 78, § 20, to delegate to a Hearing Examiner the authority to conduct any proceeding within its jurisdiction. At the conclusion of the hearing, the Hearing Examiner files a proposed order, including findings of fact, which becomes final unless appealed to the Commission. If an appeal is taken, the Commission considers the matter on the record made before the Hearing Examiner and issues a final order. A final order of the Commission is declared by statute to be *prima facie* correct and shall be affirmed upon any petition for judicial review unless clearly shown to be (1) in violation of constitutional provisions, (2) not within the statutory authority or jurisdiction of the Commission, (3) made upon unlawful procedure, (4) arbitrary or capricious, (5) affected by other error of law, or (6) if entered in a contested case, not supported by substantial evidence on the record considered as a whole. Art. 78, § 97.

Mr. Hendricks availed himself of these various procedures. In May, 1993, he filed an informal consumer complaint with the PSC, which referred the complaint to a CAPA Utility Affairs Specialist. That individual, after getting a response from BG & E, found in favor of the company, as did the

Director. Hendricks then filed a complaint with the Commission, which delegated the matter to a Hearing Examiner. The only significant factual issue was whether Hendricks had ordered the utility service provided from July 30, 1990 until July 24, 1991. If he did, he was responsible for the charges for that service and, unless the bill was paid, BG & E was entitled to terminate service; if he did not, BG & E was not entitled to terminate service.[2]

At the commencement of the hearing, a question arose over who was to proceed first. The Hearing Examiner decided that, as the complainant, Hendricks should proceed first, although he made clear that the order of presentation did not resolve the more important question of who had the burden of proof and persuasion.

Hendricks called as his first witness a BG & E consumer representative, Jerry Johnson. Mr. Johnson stated that BG & E records indicated that, on July 27, 1990, James Dandridge, the then-current occupant of 4500 Kathland Avenue, in whose name service was then being provided, called to terminate the service in his name. Later that day, another call was received from a person claiming to be Michael Hendricks, who asked that service be placed in his name at that address. The caller provided certain personal information, including Hendricks's former address at 581 Laurens Street and his Social Security number. BG & E told the caller that a $20 application fee and a $174 deposit would be required. Neither was ever paid. BG & E took a final reading of the meters and sent Dandridge a final bill, which also was never paid. Nonetheless, the company switched the service to Hendricks's name.

Not only were the fees and the final bill to Dandridge not paid, no payment was ever made for subsequent service.

---

**2.** Hendricks never contested that he was responsible for service from and after July 24, 1991. One problem was that BG & E had not read the gas and electric meters for nearly a year, until September 19, 1991, and it included in the bill sent following that reading unsegregated charges for the entire period. It was not clear, therefore, how much was actually in dispute. As we indicated in footnote 1, *supra*, the parties eventually resolved that part of the dispute.

Although it sent a monthly bill for the $20 application fee, BG & E, for whatever reason, was unable to gain access to the property to read the meters, and it therefore sent no bills for contemporaneous service. Moreover, as the company had a policy of not terminating service until the customer received a first bill and refused to pay, it never sought to terminate the service, notwithstanding the lack of any payment for over 11 months. Mr. Johnson stated that the company had no record of Mr. Hendricks's calling in July, 1991, and that, had he done so, the company would not have missed the fact that service was already in his name. In summary, Johnson said that, because the second caller on July 27, 1990, gave identifying information, the company assumed that he was, in fact, Hendricks.

Mr. Hendricks denied that he ordered gas and electric service on July 27, 1990. He testified, and presented documentary evidence to establish, that he did not obtain title to the property until January, 1991, and that he did not move into it until July of that year.

Until January, 1991, the property was owned by Mr. Dandridge, with whom Mr. Hendricks had a number of business dealings. In 1988, Hendricks lent Dandridge $30,000 and, when the loan was not paid, Hendricks filed suit and obtained a judgment. In April, 1990, he executed upon the property and purchased it at a sheriff's sale. Because Mr. Hendricks was unable to pay all of the fees and costs associated with the auction sale right away, the sheriff's deed to him was not dated and acknowledged until January, 1991, and it was not recorded until August, 1993, when delinquent taxes were finally paid. Mr. Hendricks stated that, because of Dandridge's violent nature, he was afraid to move into the property until after he received his deed from the sheriff, that the property was in bad shape, and that he did not have the funds to make necessary repairs and improvements until July, 1991. In the meanwhile, he said, Dandridge continued to live in the property and to regard it as his own. In support of that statement, Hendricks placed into evidence a note for $14,000 signed by Dandridge on June 17, 1992, secured by a deed of

trust on the property executed the same day. As a result of that conveyance, Hendricks was required to file a complaint against the lender to quiet title.

Mr. Hendricks stated that, until July, 1991, he lived with his mother at 4718 Dunkirk Avenue. In support of that contention, he presented pay stubs from his job as a substitute school teacher in Baltimore City. Stubs covering the period up to July 9, 1991 show Dunkirk Avenue as his address; others, covering the period after August 15, 1992, show 4500 Kathland Avenue as his address.[3]

No doubt in an effort to explain or rebut the evidence relating to the second call made to BG & E on July 27, 1990, Mr. Hendricks claimed that Mr. Dandridge must have made that call. He presented evidence that Dandridge was angry at him for purchasing the property at the sheriff's sale and thus had a reason to cause Hendricks harm or embarrassment. Immediately after the sale, he said, Dandridge physically attacked him, leading Hendricks to report the matter to the police. A police report and a subsequent subpoena issued by the District Court were introduced into evidence, the latter showing Hendricks's address in April, 1990, as the Dunkirk Avenue residence. Additionally, he stated that, through the course of their dealings, Dandridge had the personal information—Hendricks's former address and Social Security number—given to BG & E on July 27, 1990.

In their written submissions to the Hearing Examiner after the hearing, the parties disputed which side had the burden of proof. BG & E argued that it had "established a *prima facie* case that Mr. Hendricks applied for service on July 27, 1990, and at that point in time became the customer of record liable for service used at the premises...." Regarding Hendricks's defense as essentially a claim of fraud on the part of Mr. Dandridge, it urged that Hendricks had the burden of proving

---

**3.** Mr. Dandridge offered other documentary evidence showing his address as 4718 Dunkirk Avenue, but that evidence related to times or events occurring before July 30, 1990, and was therefore only marginally relevant.

that fraud by clear and convincing evidence, citing as authority *Everett v. Baltimore Gas & Elec.*, 307 Md. 286, 302, 513 A.2d 882, 890–91 (1986). Noting that Hendricks had acquired title to the property in January, 1991, the company additionally contended that, as the title owner, he should be held responsible for the charges. People's Counsel, on behalf of Mr. Hendricks, disagreed. He argued that Hendricks had satisfied the minimal burden he had under *Everett* to establish a dispute, and that it was then incumbent upon BG & E, as the entity seeking termination of service, to prove that Hendricks was responsible for the unpaid bill.

On August 25, 1994, the Hearing Examiner issued a Proposed Order resolving the complaint in favor of Mr. Hendricks. He asserted that "the key factual dispute in this case comes down to the question of who ordered utility service in July 1990 at the premises in question . . ." and concluded that the "weight of evidence does not support the conclusion that Michael Hendricks made the telephone call applying for service in his name on July 27, 1990 or otherwise occupied the premises at that time, and he is therefore not responsible for the utility service at that time."

The Hearing Examiner made reference to the dispute over burdens of proof and responded, in a footnote, that "[w]hile the higher 'clear and convincing' standard may be necessary to establish fraud in actions against the perpetrator, the 'preponderance of the evidence' standard is the applicable standard in this billing dispute between the Company and non-fraudulent customer." He declared further, however, that "[i]rrespective of who may have the burden, I find that Mr. Hendricks has shown by the preponderance of the evidence on the record that he did not order service in July 1990 so that he is not responsible for such utility service until he did request service in July 1991."

In explanation, the Hearing Examiner recounted some of the evidence that led him to that conclusion, including that Hendricks had presented "a very believable scenario" that the former owner and occupier, Mr. Dandridge, had sufficient

information to make the application in Mr. Hendricks's name and a behavior pattern to make that scenario "the most likely explanation." Noting in particular that Dandridge had put a deed of trust on the property even after he ceased to have an ownership interest in it, the Hearing Examiner found it plausible that anyone who would commit such a fraudulent act could very well have requested service in Hendricks's name. His ultimate conclusion was "that the record in this case supports the position of Mr. Hendricks that he did not occupy or otherwise order utility service at 4500 Kathland Avenue until July 24, 1991, and he is therefore not responsible for utility service prior to such date."

BG & E appealed the Hearing Examiner's decision to the full Commission, arguing that the Hearing Examiner erred in applying the "preponderance" standard of proof to Hendricks's allegation of fraud by Dandridge and that, in any event, Hendricks had failed to meet his burden under that standard. It contended that the "clear and convincing" standard of proof should have applied and that, under that standard, Hendricks could not have satisfied his burden.

The Commission rejected that argument and, on May 8, 1995, adopted the Proposed Order of the Hearing Examiner. Finding BG & E's reliance on *Everett* misplaced, the Commission determined that Hendricks

"did not bear the burden of proving that Mr. Dandridge fraudulently or illegally applied for utility service in July, 1990. Nor does the Commission make any factual finding that Mr. Dandridge fraudulently applied for utility service from BGE in July, 1990, since such a finding is not necessary to resolve this case."

The Commission concluded from *Everett* that, in a proposed termination of service case, when the customer demonstrates a bona fide dispute, the utility bears the burden of production and persuasion in establishing grounds for the termination. In the instant case, it found that Mr. Hendricks had, indeed, established a bona fide dispute as to whether he had ordered the service in July, 1990, and that BG & E therefore bore the

burden of establishing that he was responsible for the charges emanating from that service. On the totality of the evidence, as analyzed by the Hearing Examiner, the Commission concluded that the company had not met that burden.

Responding to BG & E's petition for judicial review, the circuit court reached essentially the same conclusion. So shall we.

## II. *DISCUSSION*

This is a simple case that is absolutely controlled by the clear pronouncements of this Court in *Everett v. Baltimore Gas & Elec., supra*, 307 Md. 286, 513 A.2d 882. In making its argument that "the Commission erred in holding that there is no burden on a complaining customer to prove his allegations of fraud by a third party," BG & E, unfortunately, misperceives the issue and misconstrues what we held in *Everett*.

*Everett* was a fraud case. BG & E attempted to terminate utility service to Ms. Everett at 1600 Chilton Street because she had, in its view, fraudulently obtained gas and electric service at another property, 508 E. 43rd Street, and had failed to pay the charges for that service. Upon Everett's complaint, the PSC had determined that, in such a case, the utility had the burden to prove, by a preponderance of evidence, that the customer engaged in the fraud and was responsible for the bill. It found that BG & E had met that burden, however, and therefore dismissed the complaint. The circuit court, on judicial review, agreed with the allocation of the burden but concluded that the proper standard was clear and convincing evidence, not a mere preponderance. The Court of Special Appeals also agreed that BG & E bore the burden of justifying the termination of service but held that the issue was not whether Everett had engaged in fraud, but simply whether she was responsible for the charges for service rendered to the 43rd Street address. *See Baltimore Gas & Elec. v. Everett*, 61 Md.App. 288, 486 A.2d 248 (1985), *rev'd*, 307 Md. 286, 513 A.2d 882.

This Court agreed with the circuit court that the case did present an issue of fraud and that the proper standard of proof was clear and convincing evidence. In addressing the *allocation* of the burden, we held, first, that a customer disputing the proposed termination of service bears an initial burden of "alleging sufficient facts to show that a bona fide dispute exists between [him or] her and the utility as to the proposed termination of service." 307 Md. at 296–97, 513 A.2d at 887–88. Once that initial burden is met, however, the burden of persuasion shifts to the utility. We held: "At a hearing to determine the appropriateness of the proposed termination of a customer's service, the burden of going forward and the burden of persuasion rest on the utility to establish sufficient grounds to justify the proposed termination." 307 Md. at 297, 513 A.2d at 888.

We pointed out, in support of that conclusion, that, as a regulated utility, BG & E has an affirmative duty to provide service to the public, that to discontinue service it must have grounds for termination, and that, when "a bona fide controversy or dispute exists between the utility and the customer, the utility must show that the proposed termination is justified." 307 Md. at 298, 513 A.2d at 888. We noted as well that placing the burden of persuasion on the utility was consistent with common law principles regarding the allocation of the burden of proof, in that "the party seeking to change the status quo bears the risk of failure of proof or persuasion." *Id.*

With respect to the standard of proof, we found it significant that the company was not seeking to terminate Everett's service because the service at her present premises was used fraudulently, but rather because she allegedly obtained service at another property in a fraudulent manner. The service at that property was not in her name, and she was therefore not the "customer" with respect to that service. BG & E's claim against her was not based on a contractual obligation, but strictly on fraud. That kind of allegation, we held, had to be

proved by clear and convincing evidence. 307 Md. at 299–304, 513 A.2d at 889–91.[4]

■ BG & E is not contending, in this case, that Mr. Hendricks obtained any service, at Kathland Avenue or anyplace else, by fraud. It was attempting to terminate current service at Kathland Avenue because it believed that Mr. Hendricks had failed to pay for earlier service rendered at that address, for which, as a customer of that service, he was contractually responsible. Once Hendricks presented a bona fide dispute as to his responsibility for that earlier service, however, under the clear and unmistakable holding in *Everett,* BG & E had the burden of justifying its right to terminate the service. The PSC and the circuit court were absolutely correct in so holding. As the only basis for the proposed termination was Hendricks's responsibility for the pre-july, 1991 service, BG & E was obliged to show, by a preponderance of the evidence, that Hendricks was, indeed, responsible for that service.

■ Unlike *Everett,* this is not a case of fraud. Mr. Hendricks did not have to prove fraud on the part of Mr. Dandridge. All he had to do was to generate a bona fide dispute as to whether he was responsible for the service prior to July 24, 1991, and he clearly did so. He established the controversy largely through his own testimony, which would have sufficed on its own to generate the dispute, but which he nonetheless supported through his pay stubs and the other documentary evidence showing that, until January, 1991, he was not the owner of the property and until July 24, 1991, he was not residing in the property.

---

**4.** When the General Assembly rewrote the State Administrative Procedure Act in 1993—seven years after our discussion in *Everett*—it directed that the standard of proof in contested cases under the Act shall be the preponderance of evidence unless the standard of clear and convincing evidence is imposed on the agency by regulation, statute, or constitution. *See* Maryland Code (1995 Repl.Vol. & Supp.1996), § 10–217 of the State Government Article.

The evidence regarding Mr. Dandridge was simply corroborative; it offered a reasonable explanation of who, if not Mr. Hendricks, may have ordered the service switched into Hendricks's name in July, 1990. That was not anything Mr. Hendricks had to prove in order to thwart BG & E's threatened termination of service. If believed by the Hearing Examiner, as it was, it simply made Hendricks's denial that he ordered the service more credible.

**JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.**